(Slip Opinion)

# Status of the Refundable Portion of Certain Tax Credits as Federal Public Benefits

The refundable portions of refundable tax credits, as a class, are benefits to taxpayers within the meaning of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as codified in relevant part at 8 U.S.C. § 1611.

The refundable portions of the Earned Income Tax Credit, the Additional Child Tax Credit, the American Opportunity Tax Credit, the Premium Tax Credit, and the Saver's Match Credit are "Federal public benefits" under 8 U.S.C. § 1611(c) and hence are not available to non-qualified aliens under 8 U.S.C. § 1611(a).

November 19, 2025

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 ("PRWORA"), generally prohibits non-qualified aliens, including aliens in the United States illegally, from receiving "any Federal public benefit." 8 U.S.C. § 1611(a). "Federal public benefit" for this purpose includes "any retirement, welfare, health, . . . postsecondary education, . . . or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." *Id.* § 1611(c)(1)(B). On February 19, 2025, President Trump directed agencies to identify programs that, notwithstanding this clear dictate, might be providing public benefits to illegal aliens. Exec. Order No. 14218, 90 Fed. Reg. 10,581, 10,581 (Feb. 19, 2025).

In 2020, our Office concluded that the refunded portions of refundable tax credits,[1] as a class, were benefits to taxpayers within the meaning of PRWORA.[2] Memorandum for Brian Callanan, General Counsel, Depart-

---

[1] References to the refunded portion of a refundable income tax credit refer to that portion of the refundable amount of a tax credit that exceeds the taxpayer's income tax liability under subtitle A of the Internal Revenue Code and that generates an overpayment that may be refunded to the taxpayer. *See* 26 U.S.C. § 6401(b)(1). These references do not refer to portions of a tax credit that merely offset the taxpayer's income tax liability.

[2] For the avoidance of doubt, our 2020 analysis was limited to individual income tax credits and did not address other types of credits—*e.g.*, credits provided to business

1

ment of the Treasury, from Jennifer L. Mascott, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Aliens' Limited Eligibility for Certain Refundable Tax Credits* at 6–8 (Dec. 9, 2020) ("2020 Opinion"). Our Office then applied that analysis to conclude that the specific credits in question, namely the Earned Income Tax Credit ("EITC"), the Additional Child Tax Credit ("ACTC"), and the American Opportunity Tax Credit ("AOTC") could reasonably be construed to fall within the definition of "Federal public benefits" that are barred to non-qualified aliens, including illegal aliens, under PRWORA. *Id.* at 11–14. In response to Executive Order 14218, you have asked us two questions about the 2020 Opinion. *First*, you have asked whether the 2020 Opinion provides the best reading of the law as required by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). *Second*, you have asked if two additional refundable tax credits—the Premium Tax Credit and the Saver's Match credit—constitute "Federal public benefits." The answer to both questions is yes.

## I.

It has long been Congress's policy that the federal welfare system should not incentivize illegal immigration by providing aliens and their families with benefits. *See* 8 U.S.C. § 1601(2)(B), (6). To that end, as part of a comprehensive reform of the federal welfare system, Congress in section 401 of PRWORA mandated that, "[n]otwithstanding any other provision of law," outside certain narrow exceptions, "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit." *Id.* § 1611(a). The definition of "qualified alien" encompasses aliens with a number of immigration statuses allowing them to reside in the United States; it does not include those aliens who are here illegally. *See id.* § 1641(b)–(c).

To effectuate Congress's general policy that taxpayer dollars should not be used in a way that encourages illegal immigration, PRWORA broadly defines a prohibited "Federal public benefit" to include:

---

taxpayers or credits against other types of taxes. Our analysis here is similarly limited. Referring to "tax credits" is shorthand for the clunkier "individual income tax credits."

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and
>
> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

*Id.* § 1611(c)(1).

In 2020, the Department of the Treasury asked us whether the refunded portions of the EITC, ACTC, and AOTC fall within the definition of "Federal public benefit." We concluded that, as a class, the refunded portions of many refundable tax credits fall within that definition. PRWORA, we explained, bars non-qualified aliens, including illegal aliens, from receiving "[1] benefit[s] for which payments or assistance are provided to [2] an individual, household, or family eligibility unit by [3] an agency of the United States or by appropriated funds of the United States." 2020 Opinion at 6–8 (quoting 8 U.S.C. § 1611(c)(1)(B)). Because the refunded portions of the EITC, ACTC, and AOTC fulfill each of these three requirements, we concluded that they could reasonably be construed as meeting that definition.

*First*, the refunded portions of these credits benefit recipients. Unlike a tax deduction, which reduces taxable income, a tax credit is "subtracted directly from one's total tax liability, dollar for dollar." *Black's Law Dictionary* 1768 (12th ed. 2024) (defining "tax credit"). For low-income earners who owe less tax than the amount of the credit, a *refundable* tax credit may result in a monetary payment to the taxpayer. 2020 Opinion at 7; *see also* 26 U.S.C. §§ 6401(b), 6402; *Sorenson v. Sec'y of the Treas.*, 475 U.S. 851, 854–55 (1986). Such a payment, we explained, is a "benefit" that resembles a grant, which is specifically included in 8 U.S.C. § 1611(c)(1)(A), because each is "something [of value] that the government affirmatively awards to a recipient." 2020 Opinion at 7. We further noted that the "reference in section 1611(c)(1)(B) to 'payments *or assistance*'" supports a broad reading of the term "Federal public benefit," since assistance may be conferred in many different ways. *Id.* at 7–8 (collecting examples).

*Second*, refundable individual income tax credits are provided to "an individual, household, or family eligibility unit." *Id.* at 8 (quoting 8 U.S.C. § 1611(c)(1)(B)). The Internal Revenue Service ("IRS") treats a "refundable credit in the same manner as an overpayment of tax." *Id.* (citing 26 U.S.C. § 6401(b)(1) and 26 C.F.R. § 301.6401-1(a)(2)). Unless used to offset other obligations, the refunded portion of the tax credit is paid to the taxpayer, either as an individual or (in the case of joint filers) a household. 26 U.S.C. § 6402(a); 26 C.F.R. § 301.6402-3(a)(6).

*Third*, the refunded portion of a refundable tax credit comes from an "agency of the United States" and from "appropriated funds of the United States." *See* 2020 Opinion at 8 (quoting 8 U.S.C. § 1611(c)(1)(B)). Specifically, the IRS pays the refunds from permanent indefinite appropriations set aside for "refunding internal revenue collections." 31 U.S.C. § 1324(a).

This straightforward textual analysis led us to conclude that the refunded portions of refundable tax credits are generally "benefits" as that term is used in PRWORA. *See* 2020 Opinion at 8. Proceeding from that understanding, we then specifically analyzed whether the EITC, 26 U.S.C. § 32, ACTC, *id.* § 24(d), and AOTC, *id.* § 25A(i), are "Federal public benefits" which may not be provided to most non-qualified aliens consistent with 8 U.S.C. § 1611(c)(1)(B). We concluded that the EITC and ACTC are properly understood as "welfare" benefits or at least benefits "similar" to welfare benefits, and that the AOTC is plainly a "postsecondary education" benefit. 2020 Opinion at 11–14 (explaining why each of the credits at issue fell within a category of benefits that non-qualified aliens are ineligible to receive). Hence, the "plain language" of PRWORA compelled the conclusion that the refunded portions of these tax credits are "Federal public benefits." *Id.* at 14–15.

## II.

In response to the President's directive that agencies examine whether they are complying with PRWORA, you asked us whether the 2020 Opinion reflects the "best reading of the statute" as required by *Loper Bright*, 603 U.S. at 400, or merely a reasonable policy choice as permitted by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* Memorandum for the Office of Legal Counsel from the Department of the Treasury, *Re: "Ending Taxpayer Subsidization of Open Borders" Executive Order and Refundable Tax Credits* (Apr. 17,

2025) ("Treasury Request"). In doing so, you asked us to explain how our analysis interacts with separate eligibility requirements that Congress has imposed on certain refundable tax credits and how our analysis can be reconciled with *Sorenson v. Secretary of the Treasury*, 475 U.S. 851 (1986). Having reconsidered the question, as well as the potentially contrary authorities highlighted in your request, we confirm that our 2020 Opinion reflects a reasonable view of the law. Indeed, it is the best view of the law.

## A.

In *Chevron*, the Supreme Court stated that, "if [a] statute is silent or ambiguous with respect to [a] specific issue," courts could review an agency's interpretation of the statute regarding that issue only to decide whether the interpretation was "permissible." 467 U.S. at 843. In other words, the agency did not need to ground its actions in the best interpretation of the statute; instead, it could act on merely a "reasonable" one. *Id.* at 844; *see also, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 984–85 (2005). Consistent with that regime, we concluded in our 2020 Opinion that it was "reasonable" to interpret PRWORA as making the refunded portions of refundable tax credits generally unavailable to certain aliens. 2020 Opinion at 2. We refrained from saying that the statute could *only* be read to make those refunded portions unavailable.

In *Loper Bright*, the Supreme Court overruled *Chevron* and held that courts may generally no longer defer to agencies' "permissible" or "reasonable" interpretations of ambiguous statutes. 603 U.S. at 400, 412–13. You have accordingly asked us to confirm that our 2020 Opinion reflects the best interpretation of PRWORA. Treasury Request at 2. It does.

As our 2020 Opinion explains, PRWORA prohibits a non-qualified alien from receiving "any Federal public benefit" "[n]otwithstanding any other provision of law." 2020 Opinion at 2 (alteration in original) (quoting 8 U.S.C. § 1611(a)). PRWORA also, in turn, defines "Federal public benefit" to encompass certain types of "benefit[s] for which payments . . . are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(B). Like the benefits specifically included in the definition, the refunded portion of a refundable tax credit is a

"'payment' because it gives the taxpayer money that the taxpayer did not earn and would not have received, but for the existence of the government program" providing the benefit. 2020 Opinion at 7. Further, the IRS—an "'agency of the United States'"—makes those payments from appropriated funds of the United States. *Id.* at 8 (quoting 8 U.S.C. § 1611(c)(1)(B) and citing 31 U.S.C. § 1324). Hence, if the refundable tax credit is a "retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit"— or "any other similar benefit"—then the refunded portion is a "Federal public benefit" that cannot be paid to non-qualified aliens, including illegal aliens, consistent with PRWORA. *Id.* at 6–8 (quoting 8 U.S.C. § 1611(c)(1)). The 2020 Opinion explained that the refunded portions of the EITC, ACTC, and AOTC met that definition because they were "welfare," "postsecondary education," or "similar" benefits. *Id.* at 11–14. Although there are counterarguments,[3] we find that analysis to be as compelling today as it was five years ago, and it reflects a reading of the statute that is better than the alternatives.

If anything, the Treasury Department's 2020 question and our 2020 Opinion anticipated *Loper Bright*. In 2020, your office asked us for a "formal opinion on the best interpretation of the law on [the relevant] issue." *Id.* at 6 (internal quotation marks and citation omitted). Our answer analyzed PRWORA's text and context using traditional methods of statutory interpretation to conclude that PRWORA's prohibition reached the refunded portions of the EITC, ACTC, and AOTC. In other words, we "use[d] every tool at [our] disposal to determine the best reading of the statute"—just as *Loper Bright* demands of courts that are reviewing agencies' legal interpretations. 603 U.S. at 400.

True, our 2020 Opinion said that we "believe[d] it [was] *reasonable* to conclude that PRWORA makes the refunded portions of [the relevant tax] credits generally unavailable to non-qualified aliens." 2020 Opinion at 2 (emphasis added). We also declined to conclude that our reading of the statute was "the only permissible reading" under *Chevron*. *Id.* But those

---

[3] The 2020 Opinion canvased these counterarguments at length. 2020 Opinion at 11–19. To the extent your latest request implicates these same counterarguments, we discuss those arguments below. We find the remaining counterarguments discussed in the 2020 Opinion no more persuasive now than we did then, and we do not address them again in this opinion.

statements indicated only that the statute was not free from ambiguity. *See Brand X*, 545 U.S. at 984–85. The reasons cited in 2020 for why PRWORA could *reasonably* be interpreted to prohibit monetary payments to non-qualified aliens in the form of refunded portions of certain tax credits are the same as those that indicate today why PRWORA is *best* interpreted to prohibit such largesse.

## B.

Next, you asked whether certain eligibility requirements that Congress enacted for refundable tax credits in PRWORA itself and later, in 2020 and 2021, call our 2020 conclusions into question. They do not.

## 1.

We begin with some context. Before PRWORA, the EITC statute stated that a taxpayer needed to supply a Taxpayer Identification Number ("TIN") for each child listed on the taxpayer's return for purposes of determining the taxpayer's EITC. 26 U.S.C. § 32(c)(3)(D)(i) (1994). In addition, taxpayers had to supply their own TIN and their spouse's TIN to file a return. *See* 26 C.F.R. § 301.6109-1(b) (1995). Section 451 of PRWORA amended 26 U.S.C. § 32(c) to say that, in order to claim the EITC, the taxpayer must include Social Security numbers ("SSNs") for the filer, the filer's spouse, and any children on the return. Moreover, those SSNs must "not be obtained solely for the purposes of applying for or receiving federally funded benefits." 2020 Opinion at 15–16. Rather, "aliens applying for the EITC must report either an SSN issued on the basis of their lawful authority to work in the United States . . . or a grand-fathered SSN issued prior to 2003 for the limited purpose of acquiring a driver's license or bank account." *Id.* at 3 n.3 (citation omitted) (citing 42 U.S.C. § 405(c)(2)(B)(i) and Cong. Budget Off., *Options for Reducing the Deficit: 2019 to 2028* at 248 (2018)).

The Commissioner of Internal Revenue cited this SSN requirement in a 2011 letter to the Chairman of the Senate Committee on Finance, explaining his understanding that PRWORA's SSN requirement was the method by which Congress meant to regulate aliens' eligibility for the EITC. *Id.* at 6 (citing Letter for Senator Max Baucus, Chairman, Committee on Finance, from Douglas H. Shulman, Commissioner of Internal Revenue at

3 (Nov. 7, 2011) ("Shulman Letter")). The Commissioner inferred from this purported regulatory approach that Congress did not intend to regulate eligibility through 8 U.S.C. § 1611's general prohibition on the receipt of federal public benefits by non-qualified aliens. *See id.* at 14 (citing Shulman Letter at 3). Based in part on this inference, the Commissioner extrapolated "'that a tax credit, refundable or otherwise, is not a Federal public benefit' under PRWORA." *Id.* at 6 (quoting Shulman Letter at 2–3).

As we explained in 2020, the Commissioner was incorrect. Among other things, we observed that section 401(a) of PRWORA (prohibiting aliens from receiving "Federal public benefits") and section 451 of PRWORA (requiring the submission of SSNs for the EITC) complemented one another. 2020 Opinion at 15–16. Both sections reduced the likelihood that illegal aliens will receive federal public benefits, and the existence of one section does not suggest that Congress intended to displace the other. Rather, they suggest that Congress sought through multiple means to reduce incentives to immigrate illegally. *See id.* at 16. The EITC's SSN requirement also served a distinct purpose: helping to stop *any* recipient, alien or otherwise, from defrauding the EITC program. *See id.* at 17.

In explaining as much, we stated that, "[e]ven before PRWORA, Congress had barred *nonresident aliens* from claiming the EITC." *Id.* at 16 (emphasis added) (citing 26 U.S.C. § 32(c)(1)(E) (1994)). And, referring back to "nonresident aliens," we noted that Congress apparently "viewed an SSN-reporting requirement as supplementing, not supplanting, an underlying eligibility requirement *turning on immigration status*." *Id.* (emphasis added).

In your letter, you ask us to reconcile those statements with the fact that, when it comes to paying taxes, "nonresident alien" is not an immigration status but instead is a defined term under the Internal Revenue Code ("IRC"). Treasury Request at 2–3. Your letter suggests our 2020 Opinion may have been imprecise in saying that eligibility for the pre-PRWORA EITC "turn[ed] on" "immigration status." *Id.*

We agree that "nonresident alien" status for purposes of the IRC turns on more than "immigration status" standing alone. Nevertheless, immigration status remains highly relevant. Specifically, the IRC defines a "nonresident alien" as anyone other than a citizen or a "[r]esident alien." 26

U.S.C. § 7701(b)(1). In broad strokes, a "resident alien" is an alien who was a lawful permanent resident or otherwise had a "substantial presence" in the United States during the relevant tax year. *See id.* Because the "nonresident alien" determination takes account not only of a person's physical presence in the United States but also whether the person is a citizen or lawful permanent resident, *see id.*, immigration status remains very much a component of the definition of "nonresident alien." Read in context, then, the relevant language from the 2020 Opinion was simply making the point that the IRC uses an SSN-reporting requirement to supplement an eligibility requirement that turns *in significant part* on immigration status.

Further, even if immigration status under the Immigration and Nationality Act were entirely irrelevant to whether an individual is a "nonresident alien" under the IRC, our bottom-line conclusion would not change. Congress explicitly stated in section 401 of PRWORA that the statute's prohibition on receipt of benefits applies "[n]otwithstanding any other provision of law." 8 U.S.C. § 1611(a). Such a "'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section" of a law. *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (citation omitted); *see also, e.g.*, *NLRB v. SW General, Inc.*, 580 U.S. 288, 299 (2017). When it comes to PRWORA's ban on providing benefits to non-qualified aliens, the SSN requirement in section 451 of PRWORA, as codified in 26 U.S.C. § 32(c) and (m), is one such "other provision of law." Section 401 of PRWORA thus takes precedence over section 451 of PRWORA, and our 2020 Opinion was correct to conclude that section 451 does not carve out refundable tax credits from section 401's prohibition.

Moreover, the SSN reporting requirement still supplements PRWORA's prohibition. As the 2020 Opinion points out, "most nonresident aliens with SSNs are 'non-qualified aliens' under PRWORA." 2020 Opinion at 18 (citation omitted). The use of "nonresident alien" status in the eligibility criteria for the EITC thus could have functioned as a proxy (albeit an imperfect one) for "immigration status" even prior to PRWORA. Then, in PRWORA, Congress tightened the connection between EITC eligibility and immigration status both by prohibiting non-qualified aliens from receiving benefits *and* by enacting the SSN requirement. We believe the 2020 Opinion was correct that the "practical means

of restricting EITC benefits" through the SSN requirement and the out-right "prohibition in section 1611" "reinforce" the same congressional goal—preventing illegal aliens from receiving public benefits. *See id.* at 15–16.

As a result of Congress's decision to pursue its goal through multiple means, some aliens may be ineligible for the EITC both because they are disqualified by 8 U.S.C. § 1611 *and* because they lack SSNs of the type the EITC requires. But this is not true for all aliens. Some aliens are "qualified" under 8 U.S.C. § 1641(b) yet still lack an SSN that would satisfy the EITC's requirements. For example, aliens paroled into the United States for at least one year under section 212(d)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5), are qualified aliens. *See* 8 U.S.C. § 1641(b)(4). Yet they do not necessarily have SSNs that would suffice for purposes of the EITC. Such parolees generally need work authorization[4] prior to being eligible for the EITC, and parolees do not automatically receive work authorization; rather, they must apply to U.S. Citizenship and Immigration Services ("USCIS") for that authorization. 8 C.F.R. § 274a.12(c)(11); *see also id.* § 274a.12(c)(11) (1995) (same prior to enactment of PRWORA). For parolees lacking work authorization, PRWORA would not bar the receipt of the EITC, but the requirement of a certain kind of SSN would impose a bar. Conversely, an alien who has been paroled into the country for less than one year but who has applied for and obtained work authorization could satisfy the SSN requirement of the EITC, yet would still be barred from receiving that benefit by PRWORA.

Even if there were a more perfect overlap between qualified aliens under PRWORA and aliens who can obtain SSNs entitling them to the EITC, our conclusion would not change: "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, [we] must give effect to both." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (citation omitted); *see also Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020) (recognizing that Congress sometimes uses a "belt and suspenders" approach to

---

[4] As noted above, a parolee who is not authorized to work might still be eligible for the EITC if he has a grandfathered SSN issued prior to 2003 for the purpose of acquiring a driver's license or bank account. 2020 Opinion at 3 n.3. Given the passage of time, we presume this class of aliens is small and shrinking, but it may still exist.

legislating). Far from creating such a repugnancy, the limitation in 8 U.S.C. § 1611 on eligibility and the requirement of qualifying SSNs for the EITC work in tandem to advance the congressional goal of limiting eligibility for benefits to certain categories of individuals. As a result, the fact that the two statutes might at times "overlap" is not a basis for interpreting 8 U.S.C. § 1611 in a manner contrary to its plain text. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 115 (2014); *Conn. Nat'l Bank*, 503 U.S. at 253.

## 2.

Next, as you point out, Congress again used SSNs to determine eligibility for certain refundable tax credits in 2020 and 2021. *See* Treasury Request at 2. In 2020, Congress provided refundable tax credits through the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 2201, 134 Stat. 281, 335–40 (2020), and the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. N, § 272, 134 Stat. 1182, 1965–71 (2020) (collectively "the 2020 credits"). In 2021, Congress again provided refundable tax credits in the American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9601, 135 Stat. 4, 138–44 ("ARPA") ("the 2021 credits"). With certain exceptions not relevant here, in order to receive the 2020 credits, taxpayers had to submit work-authorized SSNs, meaning that the individuals could legally work in the United States. 26 U.S.C. §§ 6428(g)(3)–(4), 6428A(g)(4)–(5). But for the 2021 credits, again with certain exceptions not relevant here, any SSN would do. *Id.* § 6428B(e)(2)(D)–(E).

As with the SSN requirement included in PRWORA, you have asked whether these SSN requirements, coupled with their legislative history, show that Congress intended to control eligibility for the credits through SSNs and work authorization requirements rather than through the prohibition codified at 8 U.S.C. § 1611. If so, these credits might support an inference that refundable tax credits are not "Federal public benefits" under section 1611(c). *See* Treasury Request at 2 & n.11 (citing Staff of the Joint Comm. on Taxation, 117th Cong., JCS-1-23, *General Explanation of Tax Legislation Enacted in the 117th Congress* at 28 (Comm. Print 2023) ("JCS-1-23")).

Textually, we do not see the subsequently enacted SSN requirements as meaningfully different from those that existed in prior law. *See* 2020

Opinion at 6–8, 14–15 (explaining our conclusion and commenting on the "plain language" of PRWORA). Nothing in the 2020 or 2021 legislation suggests that Congress impliedly repealed or altered PRWORA's application to those tax credits. It is a "cardinal rule" that such alterations or "repeals by implication are not favored." *Morton v. Mancari*, 417 U.S. 535, 549 (1974) (cleaned up). That cardinal rule applies with special force here, given that PRWORA limits non-qualified aliens' access to benefits "[n]otwithstanding any other provision of law." 8 U.S.C. § 1611(a). As stated above, a notwithstanding clause shows which provision prevails when statutes have an *explicit* inconsistency. *SW Gen.*, 580 U.S. at 301. It follows that 8 U.S.C. § 1611(a)—with its notwithstanding clause—likewise prevails in the face of any *implied* inconsistency.

Nor does the legislative history associated with the subsequent legislation demand a different conclusion. Because we believe our interpretation of PRWORA follows clearly from the text, it would be improper to resort to the legislative history of PRWORA itself to divine PRWORA's meaning. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) ("Legislative history . . . is meant to clear up ambiguity, not create it." (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011))). It would be even less appropriate to rely on later-in-time legislative history attached to entirely different statutes to rewrite the plain text of PRWORA. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").

Even were we inclined to delve into legislative history, the history highlighted in your request is unilluminating. That history briefly observes that, "[u]nlike the [2020 credits], the 2021 . . . credit does not require the SSN to be issued to a citizen or in relation to lawful admission for employment in the United States." JCS-1-23 at 28. It then notes the circumstances in which SSNs unrelated to citizenship or work authorization may be issued today or could have been issued in earlier years. *Id.* at 28 n.145. That is all. Nowhere does the legislative history explain why Congress required work-authorized SSNs in 2020 but not in 2021.[5]

_____

[5] Reliance on the congressional report accompanying the ARPA would be similarly misplaced even for those who credit legislative history. The report's explanation for the SSN change resembles JCS-1-23 and is no more revealing, as it, too, does not explain the

Instead, context suggests that Congress decided to dispense with the work-authorization requirement in the 2021 credits to effect a policy change by expanding access to tax credits for certain aliens. As noted earlier, *see supra* Part II.B.1, an alien can qualify for benefits under 8 U.S.C. §§ 1611(a) and 1641(b) yet still lack a work-authorized SSN. This subset of aliens includes those paroled into the country for at least one year. *See* Soc. Sec. Admin. Off. of the Inspector Gen., A-08-16-50142, *Social Security Numbers Assigned and Benefits Paid to Refugees, Parolees, and Asylees* at 1 (July 2017), https://oig-files.ssa.gov/audits/full/A-08-16-50142.pdf. In addition, PRWORA treats as "qualified aliens" those aliens who petition for immigration status under the Violence Against Women Act ("VAWA") or apply for T nonimmigrant visas. *See* 8 U.S.C. § 1641(c); *id.* § 1154(a)(1); *id.* § 1101(a)(15)(T). Aliens with pending VAWA petitions or T nonimmigrant visa applications are thus eligible for federal public benefits under PRWORA, but they do not necessarily have work authorization.[6] As a consequence, such aliens would have been ineligible for the 2021 credits had Congress retained the work-authorization requirement from the 2020 credits. The omission of the work-authorized SSN requirement in the 2021 credits accordingly demonstrates how Congress can adjust eligibility for refundable tax credits through both PRWORA and SSN requirements as its chosen policy

likely consequences of dispensing with the work-authorization requirement. *See* H.R. Rep. No. 117-7, at 722–23 (2021). In contrast, one Member of Congress did specifically address the potential consequences of requiring only a TIN (not a work-authorized SSN) for the tax credits in a different bill. *See* 166 Cong. Rec. H2253 (daily ed. May 15, 2020) (statement of Rep. Riggleman) (discussing H.R. 6800, 116th Cong. (2020)). Representative Riggleman objected to the proposed change on the grounds that it might allow illegal aliens to receive refundable tax credits, but his statements are ambiguous on the question of whether PRWORA applies to such credits. *See id.* Even were his remarks clear, we would place no weight on the statement of an individual legislator about versions of bills that were not enacted, especially when interpreting a different statute passed decades before. *See SW Gen.*, 580 U.S. at 307 ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."); *Wyeth LLC*, 562 U.S. at 242.

[6] VAWA petitioners are eligible for work authorization after their petitions are approved. 8 U.S.C. § 1154(a)(1)(K). Applicants for T nonimmigrant status receive work authorization only after USCIS has determined that their visa applications are legitimate and the applicants separately apply for work authorization. *See* 8 C.F.R. § 274a.12(c)(40) (current regulations); *see also* Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 81 Fed. Reg. 92,266, 92,285 (Dec. 19, 2016) (establishing the same requirements prior to the 2020 and 2021 tax years).

dictates. Thus, rather than one measure superseding the other, the two measures work hand in hand to ensure that only certain classes of aliens obtain the benefits Congress makes available.

## C.

You have also asked whether our interpretation of PRWORA is sound in light of *Sorenson v. Secretary of the Treasury*, 475 U.S. 851 (1986), and *Israel v. United States*, 356 F.3d 221 (2d Cir. 2004), a post-PRWORA case applying *Sorenson*. Treasury Request at 3 & n.14. You observe that the Court in *Sorenson* treated the EITC as a tax overpayment and concluded that the "'refundability'" of the EITC is "'inseparable from its classification as an overpayment of tax.'" *Id.* at 3 (emphasis omitted) (quoting 475 U.S. at 859). Our 2020 Opinion, in contrast, distinguished between the refunded portions of credits such as the EITC and refunded overpayments, "even though both kinds of payments come from the Treasury after the processing of a tax return." 2020 Opinion at 7. When it merely returns money that was overpaid, we noted, a refund "is not a 'benefit'" under PRWORA "*because* it does no more than return to the taxpayer his own money"; in contrast, the refunded portion of a refundable tax credit like the EITC *is* a "benefit" because it provides an economic windfall to the taxpayer. *See id.* (emphasis added).

Our 2020 Opinion is entirely consistent with *Sorenson*. That case concerned joint-filing taxpayers who sought a refund under the EITC but who were subject to "intercept" rules for the return of tax overpayments where one of the filers had outstanding child support obligations to which a state government had a claim. 475 U.S. at 853–56. The petitioner argued that the state could not intercept EITC refunds because those refunds did not constitute "'overpayments.'" *Id.* at 859. To address this argument, the Court interpreted three specific provisions of the IRC. *First*, section 6401(b)(1) of the IRC "defines [the refundable] amount [of the EITC] as an 'overpayment.'" *Id. Second*, section 6402(a) "provides a mechanism for disbursing overpayments" to the taxpayer who made them, "namely, the income tax refund process." *Id. Third*, section 6402(c) requires that "the 'amount of any overpayment shall be reduced'"—*i.e.*, intercepted— "'by the amount of any past-due [child] support'" obligations. *Id.* at 859–60 (cleaned up).

14

The Court concluded that, because the IRC "explicit[ly]" defines the refundable portion of the EITC as an "overpayment," the state with the relevant child-support claim could intercept it under section 6402(c). *Id.* at 860–61. Thus, the Court based its holding not on the EITC's underlying economic nature but on a specific statutory definition. That definition is titled "[a]mounts *treated* as overpayments," and it provides that the refundable portion of the EITC "shall be *considered* an overpayment." 26 U.S.C. § 6401 (emphases added). In other words, as *Sorenson* recognized, the IRC's statutory definition of "overpayment" establishes a legal fiction treating the refundable portion of the EITC like an overpayment for intercept purposes. *See* 475 U.S. at 863. But it is just that—a fiction. The IRC-specific definition does not change the economic reality that the EITC is not a refund of paid tax. Rather, "it gives the taxpayer money that the taxpayer did not earn and would not have received, but for the existence of the [credit]." 2020 Opinion at 7.

The same holds true for *Israel v. United States*, 356 F.3d 221. There, the Second Circuit applied *Sorenson* in concluding that "amounts refundable by operation of the [EITC] are sufficiently similar to excess withholding taxes to justify similar treatment." *Id.* at 226 (internal quotation marks omitted). As with the Supreme Court in *Sorenson*, the Second Circuit based this conclusion on the explicit statutory definition of EITC refunds as overpayments for tax purposes. *See id.* at 223–24. And as with *Sorenson*, the court recognized that this was a legal fiction specific to the issue before the court. *Id.* at 223 (explaining that "*deeming* refund amounts generated by the [EITC] as overpayments makes sense" for tax purposes (emphasis added)).

Having reexamined *Sorenson* in light of your specific question, we do not think the Court's application of the explicit statutory definition of "overpayment" in a different statute enacted for a different purpose alters the commonsense conclusion that the refunded portion of a refundable tax credit is a "benefit." 8 U.S.C. § 1611. By broadly defining "Federal public benefits" to include not just specific types of public aid but also "similar benefits" so long as they provide a "payment[] or assistance . . . to an individual, household, or family," PRWORA is keyed to economic reality—not to any particular legal form. *Id.* § 1611(c)(1). The economic reality of the refunded portion of a refundable tax credit is that it provides a financial windfall that the taxpayer did not earn and would not other-

wise have received. The "refundability" of a tax credit such as the EITC may indeed be "inseparable from its classification as an overpayment of tax" for purposes of the IRC, *see Sorenson*, 475 U.S. at 859, but the Court's language must be understood as applying only to the particular issue before it, *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (emphasizing that the Court's opinions "dispose of discrete cases and controversies and . . . must be read with a careful eye to context"). The fact that the IRC "deem[s]" EITC refunds to be refunds of "overpayments" for certain tax purposes, *see Israel*, 356 F.3d at 223, does not make them actual refunds of overpayments in assessing whether EITC refunds provide a "benefit" under PRWORA.

### III.

We now consider whether two specific refundable tax credits not addressed in the 2020 Opinion are "Federal public benefits" subject to PRWORA's prohibition. *See* Treasury Request at 3–4. The first is the Premium Tax Credit ("PTC"). *See* 26 U.S.C. § 36B. The second is the Saver's Match credit. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. T, § 103, 136 Stat. 4459, 5279 (2022) ("2023 CAA"). Both are "Federal public benefits."

### A.

The Patient Protection and Affordable Care Act ("ACA") requires either the state or the federal government to establish health insurance exchanges (or marketplaces). Pub. L. No. 111-148, §§ 1311, 1321, 124 Stat. 119, 173–81, 186–87 (2010); *see also* Vanessa C. Forsberg, Cong. Rsch. Serv., R44065, *Health Insurance Exchanges and Qualified Health Plans: Overview and Policy Updates* at 1 (updated May 6, 2025) ("*CRS Exchange Report*"). Through these exchanges, individuals may purchase health insurance. *CRS Exchange Report* at 1. The PTC helps an individual cover the cost of a health insurance plan's monthly premium. *Id.* at 22–23; *see also* IRS, FS-2024-30, *IRS Updates Frequently Asked Questions About the Premium Tax Credit* at 1 (Sept. 2024), https://www.irs.gov/pub/taxpros/fs-2024-30.pdf ("*IRS Fact Sheet*"). A statutory formula sets the PTC amount, with more generally awarded to those with lower incomes and thus a greater need for financial assistance to buy health insurance.

*CRS Exchange Report* at 23. Individuals claim the PTC on their tax returns but may choose to apply some or all of it to their monthly insurance premium payments in advance. 42 U.S.C. § 18082(c); *see also CRS Exchange Report* at 23 n.112. If individuals so choose, the federal government pays the PTC directly to the insurer issuing the plan. *Id.*

The refunded portion of the PTC is a "Federal public benefit" as defined in PRWORA. The PTC subsidizes the purchase of health insurance, which makes it a "health . . . benefit" or a "similar benefit" within the meaning of section 1611. 8 U.S.C. § 1611(c)(1)(B). The refunded portion of the PTC is also paid "by an agency of the United States" or by "appropriated funds of the United States." *Id.* Like the credits we discussed in 2020, the IRS pays out the refunded portion of the PTC from the source established in 31 U.S.C. § 1324. *Compare* 2020 Opinion at 8, *with* Bernadette Fernandez, Cong. Rsch. Serv., R44425, *Health Insurance Premium Tax Credit and Cost-Sharing Reductions* at 2 (updated Feb. 19, 2025) (citing 31 U.S.C. § 1324).

Next, the refunded portion of the PTC is also "provided to an individual, household, or family eligibility unit." 8 U.S.C. § 1611(c)(1). Section 1611(c)(1) uses the broad word "provide," not a more specific word such as "pay." To "provide" means simply "[t]o supply or furnish for use; to yield, afford." 12 *Oxford English Dictionary* 713 (2d ed. 1989). The refunded portion of the PTC satisfies that requirement. In some cases, a taxpayer elects to receive the portion of the PTC that exceeds tax liability as a refund when filing taxes for a given year, much like any other refundable credit. *See IRS Fact Sheet* at 2; *see also* 2020 Opinion at 8. In others, the taxpayer elects to have the government advance the PTC, including the portion that will be determined to exceed tax liability, directly to his insurer. 42 U.S.C. § 18082(c)(2)(A); *see also* Treasury Request at 4. Either way, the government "suppl[ies]" or "make[s] available" a benefit to the individual because the individual receives an unearned economic windfall.

It makes no difference that the insurer in some cases is the direct recipient of a PTC payment. As a textual matter, PRWORA's prohibition extends to benefits indirectly provided to aliens by barring not only assistance provided "by an agency of the United States," but also assistance paid for "by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(B); *see also* Interim Guidance on [Verification] of Citizen-

ship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61,344, 61,361–62 (Nov. 17, 1997); *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th Cir. 2012). Thus, even a benefit that flows indirectly to an alien through the alien's insurance company is still a federal public benefit. Indeed, to say otherwise would make little practical or economic sense. After all, the insurer is being paid for services rendered, and the person for whom the benefit is "provided" is the individual who receives those services on the government's dime. We therefore conclude that the definition of "Federal public benefit" in 8 U.S.C. § 1611(c) encompasses the refunded portion of the PTC.

Our conclusion that the refunded portion of the PTC is a "Federal public benefit" does not automatically mean that all aliens whom PRWORA defines to be "non-qualified" are ineligible to receive it. Congress can always supersede existing statutes, including PRWORA, with later-acted laws. And Congress has, in fact, addressed restrictions on aliens' eligibility for the PTC in two later-enacted statutes: the ACA and, more recently, the One Big Beautiful Bill Act, Pub. L. No. 119-21, § 71301, 139 Stat. 72, 321–22 (2025) ("OBBBA"). You have not asked us how the ACA and the OBBBA interact with PRWORA, and we do not reach this question. We conclude only that the refunded portion of the PTC is a "Federal public benefit."

**B.**

Finally, you have asked whether the refunded portion of the Saver's Match credit qualifies as a federal public benefit under PRWORA. Treasury Request at 3–4. Congress established the Saver's Match refundable tax credit for tax years beginning in 2027. 26 U.S.C. § 6433; 2023 CAA, div. T, § 103, 136 Stat. at 5279–86. If low- and middle-income individuals contribute to individual retirement accounts ("IRAs") or similar plans, this program provides a matching "credit that is payable by the Secretary of the Treasury . . . as a contribution to [an] eligible individual's applicable retirement savings vehicle, as designated by the individual." JCS-1-23 at 302; *see also* 26 U.S.C. § 6433(a)(2)(A); 2023 CAA, div. T, § 103, 136 Stat. at 5279–80. To receive the credit, an eligible individual "must elect to have the contribution made to an" IRA or similar account or plan, and the "account or plan must also (1) be for the benefit of the eligible indi-

vidual; (2) accept contributions made under [the statute], and (3) be designated by such individual . . . on the tax return for the taxable year." JCS-1-23 at 304; *see also* 26 U.S.C. § 6433(e)(2).

The Saver's Match credit funds a "retirement" or "similar benefit" and thus is also a prohibited "Federal public benefit" within the meaning of 8 U.S.C. § 1611(c)(1)(B). It is available only for individuals who made contributions to a retirement account and is generally allowable as a contribution to the individual's "retirement savings vehicle." JCS-1-23 at 302. Also, it is provided "by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(B). The Department of the Treasury makes the payment. JCS-1-23 at 302. And as explained in our 2020 Opinion, Congress established a permanent indefinite appropriation to fund such tax credits. 2020 Opinion at 8 (citing 31 U.S.C. § 1324).

The Saver's Match credit also constitutes a benefit that is "provided to an individual, household, or family eligibility unit." 8 U.S.C. § 1611(c)(1)(B). Similar to some PTC credits, Saver's Match credits are paid to a third party—here, a taxpayer's "retirement savings vehicle," JCS-1-23 at 302—rather than directly to the taxpayer. But the retirement savings vehicle must be "designated by" and "for the benefit of" the "eligible individual." *Id.* at 304. That a taxpayer must wait until retirement to spend the payment does not change the fact that the federal contribution under the program "provide[s]" a benefit for that "individual." *See* 8 U.S.C. § 1611(c)(1)(B).

Our analysis also holds true for the refunded portion of matching contribution payments that are less than $100, which an eligible individual may elect to receive as a "regular refundable credit" rather than as a contribution to a retirement savings vehicle. Treasury Request at 4; *see also* 2023 CAA, div. T, § 103, 136 Stat. at 5279. Such a credit remains a "retirement" or "similar benefit" because the individual may receive the benefit only if he or she makes qualified "*retirement* savings contributions" in exchange. *Id.* (emphasis added). And if anything, the refunded portion of such a credit more clearly falls within PRWORA because the windfall takes the form of cash provided directly "to an individual," not merely a retirement savings vehicle designated by that individual. *See* 8 U.S.C. § 1611(c)(1)(B).

## IV.

For the reasons explained above, we conclude that our 2020 Opinion reflects the best view of the law and properly concludes that, as a class, the refunded portion of refundable tax credits are benefits under PRWORA. Moreover, they may be federal public benefits if they meet the other definitional requirements of PRWORA. We also adhere to the 2020 Opinion's conclusion that the refunded portions of the EITC, the ACTC, and the AOTC are federal public benefits, and we further conclude that the refunded portions of the PTC and the Saver's Match credit are federal public benefits. Finally, we note that this same analysis may be applicable to the refunded portion of other refundable individual income tax credits, with the result that they would provide benefits under PRWORA and may be "Federal public benefits" under 8 U.S.C. § 1611.

Please let us know if we may provide any further assistance.

LANORA C. PETTIT
*Deputy Assistant Attorney General*
*Office of Legal Counsel*